**William E. SPAULDING, III, Petitioner,**

v.

**James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.**

Civ. A. No. H–93–591.

United States District Court,
S.D. Texas.

Dec. 6, 1993.

---

David B. Gerger, Federal Public Defender, Houston, TX, for petitioner.

Sharon Stowers, Texas Atty. General's Office, Austin, TX, for respondent.

## FINAL JUDGMENT

HUGHES, District Judge.

1. The court adopts the memorandum and recommendation of the United States magistrate judge signed September 10, 1993.

2. The corroborating evidence of Spaulding's guilt that was not considered by the disciplinary hearing officer is properly considered as evidence that the officer's decision was not manifestly unjust. Even without considering that evidence, the hearing satisfied constitutional standards.

3. William E. Spaulding, III's petition for a writ of habeas corpus is denied.

4. Final judgment is entered for James A. Collins.

### MEMORANDUM AND RECOMMENDATION

CRONE, United States Magistrate Judge.

I. *Introduction.*

William E. Spaulding, III ("Spaulding"), an inmate in the Texas Department of Criminal Justice, Institutional Division ("TDCJ"), challenges the April 8, 1991, decision of a prison disciplinary hearing officer finding him guilty of attempting to escape by originating and possessing a forged court order. This order purported to award Spaulding 861 additional days of good time credit, leading to his early release from prison. Upon finding Spaulding guilty, the disciplinary hearing officer assessed punishment of 1–15 days of solitary confinement, loss of 1,460 days of good time credit, and demotion from Trusty Class III to Line Class III. Transcript of Disciplinary Hearing, April 8, 1991 ("D.H."), Evidentiary Hearing, August 18, 1993 ("E.H."), Ex. F at 25–26. The 1,460 days of good time credit

ultimately were restored. E.H. at 76. Due to Spaulding's demotion to line status, however, he was ineligible for the accrual of good time at the same rate as when he was a trusty. His mandatory release date, therefore, was extended from December 13, 1994, to May 27, 1995. Collins' Post–Evidentiary Hearing Brief at 2. On the disciplinary record, the disciplinary hearing transcript, the tape recording of the disciplinary hearing, the evidentiary hearing and the submissions of the parties, this court recommends that Spaulding's petition for writ of habeas corpus be denied and that final judgment be entered for Collins.

## II. *Procedural History.*

Spaulding appealed the adverse decision of the disciplinary hearing officer through the grievance process afforded by the TDCJ. The decision was sustained at each of the three levels of the grievance procedure by the warden, the regional director, and the deputy director, respectively. Because this case involves a prison disciplinary action, it is not reviewable by the state courts and is properly brought by federal habeas corpus petition to this court. This court held an evidentiary hearing on August 18, 1993, where both parties offered testimony and introduced evidence addressing the issues raised by Spaulding's petition for habeas corpus.

## III. *Claims.*

Spaulding claims that the disciplinary process deprived him of both procedural and substantive due process in violation of the Fourteenth Amendment to the United States Constitution. Specifically, he complains of the following:

A. insufficient notice of the charges against him;

B. exclusion from the hearing;

C. not being allowed to question the informant;

D. not being given a copy of the order during the hearing;

E. not being allowed to present evidence; and

F. no reliable evidence of guilt.

In his pre-hearing brief, Spaulding also complained that the hearing officer was not neutral and detached because the investigative officers participated in the deliberations. This claim is omitted from Spaulding's post-hearing brief, and his counsel advised the court he was no longer advancing it.

## IV. *Analysis.*

### A. *Findings of Fact.*

1. Spaulding was notified of the charges against him at 11:00 a.m., April 4, 1991, by his counsel substitute, E.H. Oliver ("Oliver"). D.H. at 1; Disciplinary Record ("D.R.") at 45; E.H. at 12, 14.

2. He received a copy of the disciplinary report, which contains a description of the offense. D.H. at 1. The report states:

> On the date and time above, and at Alfred D. Hughes Unit, Inmate Spaulding, William E., III, TDCJ–ID No. 297304, did attempt to escape by originating a document that if successful would have ordered TDCJ/ID and S.O. Woods to give him, inmate Spaulding # 297304, 861 days good time credit giving him a early release from TDCJ/ID, being the document was tampered with and the Judge Charles F. Campbell Jr.'s signature was forged and the document was drawn up illegally. Major R.E. Thompson contacted Judge Campbell and the Judge did confirm that it was illegal and that his name was forged. This act is a felony in that it could fall under possession of a forged document Penal Code 32.21 or tampering with a government document Penal Code 32.10. See attached copy of court document. Major R.E. Thompson obtained possession of this document and through reliable informants learned that inmate Spaulding did originate and possess the document.

D.R. at 46.

3. This description of the offense gives adequate details to permit Spaulding to understand the charges and marshal facts in his defense, even without a copy of the forged order being furnished him.

4. Spaulding's contention that he was not permitted to see the order prior to the hear-

ing is not borne out by the record. The disciplinary record contains an affidavit executed by Spaulding on April 8, 1991, which reads, *inter alia:*

> I, William E. Spaulding, III, TDCJ/ID No. 297304, do hereby state under penalty of perjury, *that the document which has been produced in TDCJ/ID Disciplinary Report No. 910045069,* purported to be a Court Order bearing the name of said William E. Spaulding, III, TDCJ/ID No. 297304, and allegedly signed by someone other than Hon. Judge, (sic) Charles F. Campbell, was not executed by me, William E. Spaulding, III, TDCJ/ID No. 297304, and that I have *no recollection or knowledge of ever seeing this document prior to being served with Disciplinary Report No. 910045069 on 4/4/91 by Substitute Counsel Bill Oliver.*

*Id.* at 60 (emphasis added).

5. Spaulding offered this affidavit as documentary evidence at the disciplinary hearing. D.H. at 2. The page following the affidavit in the record is a copy of the forged order, which suggests that it was initially attached to the affidavit. D.R. at 61.

6. Spaulding's review of the order is further confirmed by Oliver's notes of his interview of Spaulding on April 4, 1991, where he recorded that Spaulding stated, "I don't know where this comes from or who sent it— I've never seen it before." *Id.* at 87.

7. Contrary to Spaulding's contentions, it is apparent that he at least saw a copy of the forged order on April 4, 1991, four days before the hearing, in ample time to understand the charges, marshal facts in his defense, and challenge the order at the hearing.

8. At the evidentiary hearing, Parker confirmed that a copy of the order was admitted into evidence at the hearing. E.H. at 40. She stated that Spaulding could have asked to see it during the hearing and it would have been furnished to him at that time. *Id.* at 40–42.

9. Contrary to Spaulding's assertions, the disciplinary hearing officer made a specific written finding that Spaulding "was excluded during the testimony of witnesses requested and the A/O [accusing officer] due to security risk to inmates involved." D.R. at 45.

10. The potential security risk is confirmed by additional portions of the disciplinary record furnished the court on August 18, 1993 (Docket Entry # 32). In inter-office communications dated April 3, 1991, two correctional officers reported they heard Spaulding say that there might be "three dead people" if "he found out who snitched on him." The officers stated that Spaulding mentioned the names of three inmates—"Oil Can," Jesse, and Carter—in this regard. Inmate Carter is the librarian who testified at the disciplinary hearing. D.H. at 7–12. In his Motion for Leave to Traverse (Docket Entry # 12), Spaulding identified inmates Harry Harrison and Jesse Ivey as the persons whom he believed to be the informants. At the evidentiary hearing, the disciplinary hearing officer, Captain Deborah Parker ("Parker"), testified that Harrison's nickname is "Oil Can." E.H. at 38.

11. Other testimony at the evidentiary hearing supports Parker's determination that permitting Spaulding to remain would have entailed a security risk, as does information submitted to this court *in camera.* E.H. at 17–19.

12. In accordance with TDCJ policy, Spaulding's counsel substitute, Oliver, remained throughout the proceeding. *Id.* at 24.

13. Spaulding was not excluded during the entire hearing. He was permitted to make opening and closing statements and to submit a substantial amount of documentary evidence, including his affidavit, legal briefs, and questions for cross-examination. D.H. at 1–7, 20–26; D.R. at 48–66, 69–84; E.H. at 11, 13.

14. Spaulding's request for a fellow inmate, Herbie Carter ("Carter"), to testify on his behalf was granted, as well as his requests for the presence of Major Thompson ("Thompson") and Captain Herron ("Herron"). D.H. at 1, 7; D.R. at 45.

15. The transcript of the disciplinary hearing discloses that the informant was named on seven occasions during the proceeding. In addition, Thompson gave some

details that might have narrowed down the field of potential informants. D.H. at 12–19.

16. Even if Thompson's testimony proved not to be revealing in other respects, the hearing officer who made the decision to exclude Spaulding could not have known this in advance. All testimony concerning the confidential informant reasonably could have been expected to lead to exposure of his identity.

17. Parker, the hearing officer, complied with the Rulebook by noting in the record that Spaulding "wanted informants—denied—security risk." D.R. at 45.

18. When cross-examination of the informants was mentioned at the disciplinary hearing, Parker replied, "As I stated earlier the informants will not be allowed at the hearing due to security risks." D.H. at 22.

19. Testimony of witnesses at the evidentiary hearing supported Parker's decision not to permit Spaulding to question the informant. At the evidentiary hearing, Parker explained that any questioning of the informant could have led to establishing his identity, even if the questioning had been by telephone. E.H. at 17–19, 34, 43–45, 51.

20. Although the informant was named at the disciplinary hearing, Thompson did not disclose the cell block in which the informant lived, where he worked, or for what offense he was serving time. Id. at 25, 60.

21. Any meaningful cross-examination could not have been conducted by Spaulding's counsel substitute alone. Spaulding did not provide Oliver with any questions for cross-examination of the informants. D.H. at 22. At the hearing, Spaulding admitted that he had prepared no questions and stated that he could not "really think of any questions to ask the informants" except for some limited inquiries, which potentially would have led to revealing their identity. Id.

22. For cross-examination to have been effective, Oliver would have been required to inform Spaulding of the informant's answers to generate further questions. Yet, this would have served to reveal the identity of the informant, raising the potential of retaliation. E.H. at 43.

23. There was no documentary evidence produced or witness called concerning handwriting analysis because no handwriting analysis had been performed.

24. Parker denied Spaulding's request that he be permitted to pay for handwriting analysis, commenting that the unit did not perform such analyses. D.H. at 23–24.

25. At the evidentiary hearing, Parker explained that she denied Spaulding's request for a handwriting expert because such witnesses are not allowed. E.H. at 19. She further commented that the evidence would not have been particularly relevant because Spaulding could have prevailed upon a fellow inmate to sign the order on his behalf. Id. at 33, 36. At the time, Spaulding's job at the prison was the cleaning and upkeep of the softball fields, which allowed him to walk unescorted throughout the unit, giving him unsupervised access to a number of inmates. Id. at 9.

26. Spaulding's request for handwriting analysis differs from the typical situation where documentary evidence or a witness with knowledge of relevant facts already exists. Spaulding was requesting that he be permitted to retain an expert witness from outside the prison system with no prior knowledge of the facts. The expert would have been required to examine the order, compare the handwriting on the order with that of Spaulding and an undisclosed number of fellow inmates, formulate an expert opinion, and testify about his conclusions.

27. The disciplinary hearing officer alone made the determination of Spaulding's guilt; the other witnesses had already departed at that time. Id. at 32–33, 35–36, 56–57.

28. The evidence against Spaulding did not come strictly from a confidential source. The evidence relied upon by Parker in finding Spaulding guilty included "the officer's report, the charging officer's statement taped during the hearing, as well as Major Thompson's statement on tape during the hearing, and confidential information taken during the exclusion of the accused, as well as documentary evidence of the document and letter from Judge Campbell stating that the docu-

ment bearing the signature was a forgery." D.H. at 25.

29. At the disciplinary hearing, Herron pointed out that the informant was not the total basis for the case, but that the evidence included the document itself, which bore a forged signature as verified by the judge, along with Spaulding's name and number, and awarded the additional good time solely to him. *Id.* at 19.

30. At the disciplinary hearing, Thompson named the informant on a number of occasions, stating that he had approached Thompson with the order and requested assistance in obtaining good time credit. *Id.* at 12–13. According to Thompson, Spaulding had told the informant that Spaulding had filed the order and received the extra good time. *Id.* The informant related to Thompson that he had given the order to a friend who took it to the "writ room" to look it up in the law books to see if the information that was sent to the court was there, but he could not find it. *Id.* at 13.

31. When questioned about the reliability of the informant, Thompson stated, "At the time they brought it to me I had no reason to doubt whether or not they were reliable or not." *Id.* at 12. He later testified, "At the time I had no reason to doubt what he was telling me." *Id.* at 13. He also indicated that the information was not brought to him "in a snitching type way," but rather as a request for assistance. *Id.* at 12.

32. The testimony of inmate Carter, Spaulding's own witness, corroborates Thompson's testimony concerning the informant. Carter's rather obtuse description of the events that occurred in the prison library is consistent with what the informant told Thompson about attempting to verify that Spaulding had actually received good time credit as reflected in the order. *Id.* at 7–11.

33. The informant's reliability is corroborated by the fact that he was attempting to obtain advice about obtaining good time credit based on the order, not attempting to inform on another inmate.

34. Information presented to the court *in camera*, when coupled with other information in the record, corroborates Thompson's testimony about the role of the informant in this matter.

35. At the evidentiary hearing, Parker testified that she relied upon Thompson's testimony and his determination that the named informant was a reliable person. E.H. at 19. She also stated that she found further evidence of reliability in the manner in which the order was brought to Thompson's attention, *i.e.*, as asking for assistance rather than informing on Spaulding. *Id.* at 19, 44.

36. At the evidentiary hearing, Thompson reiterated the circumstances under which he learned of the order and the fact that he had no reason not to believe the informant. *Id.* at 54–55, 64–65. Both Parker and Thompson noted that only Spaulding's name appeared on the order and no one else would have benefitted from it. *Id.* at 33, 37, 66.

37. Thompson testified at the evidentiary hearing that he had known the informant for nine years, he was aware of no grudges between the informant and Spaulding, the informant was not known for being a snitch, the informant had never lied to him before, he had a reputation for being reliable, he received no reward for the information, and he had never provided information to support a disciplinary hearing in the past. *Id.* at 55–56.

38. The informant's testimony is corroborated by the order itself. As pointed out by Herron, Parker, and Thompson, the order bore only Spaulding's name, and he was the only person who stood to benefit from the terms of the order. D.H. at 19; E.H. at 33, 37, 66.

39. The manner in which the order is written lends strong support for the contention that Spaulding prepared it. The order is replete with spelling and punctuation errors, many of which are rather idiosyncratic, that are repeated throughout Spaulding's submissions to the disciplinary hearing officer, the disciplinary review officers, and this court.

40. The word "occurred" is misspelled "occured" in the order, the word "received" is misspelled "recieved," and the word "pled" is misspelled "plead." D.R. at 61. Spauld-

ing makes the same spelling errors in his submissions. D.R. at 1, 2, 3, 14, 15, 17, 29, 31, 33, 54, 55, 58; Docket Entry # 2 & E.H., Ex. B at 3; E.H. at 85–87.

41. The order recites the date as the "6th. day of October, 1990," with a period placed after the day of the month. D.R. at 61. This unique punctuation style is likewise seen in various documents Spaulding submitted at the disciplinary hearing. *Id.* at 49, 51, 53, 57, 59. At the evidentiary hearing, Spaulding admitted that he commonly wrote dates in this manner. E.H. at 83–84.

42. Typed under the signature line of the order is "Judge, Charles F. Campbell, Jr." D.R. at 61. At the evidentiary hearing, Spaulding conceded that he generally placed a comma following a person's title. E.H. at 84. This unusual manner of punctuation is also reflected in the disciplinary record, including Spaulding's affidavit, and in submissions to the court where Spaulding writes "Judge, Campbell" or "Judge, Charles F. Campbell." D.R. at 55, 59, 60; Docket Entry # 2 & E.H., Ex. B at 3, 5, 6, 11. In Spaulding's brief in support of his petition for habeas corpus, where he ostensibly quotes the body of the disciplinary report, Spaulding twice inserts commas between "Judge" and "Charles," which do not appear in the original disciplinary report. *Compare* E.H., Ex. B at 3; D.R. at 46.

43. Spaulding entitles the order "Ex Parte, William Ellsworth Spaulding, III." D.R. at 61. In his petition for habeas corpus and his supporting brief, he similarly places a comma in a citation, *"Ex Parte, Brager."* *See* Docket Entry # 1, & E.H., Ex. A at 8; Docket Entry # 2 & E.H., Ex. B at 1. At the evidentiary hearing, Spaulding admitted that he commonly cited cases containing the *ex parte* notation in this fashion. E.H. at 83.

44. In order for a fellow inmate to have effected the forgery, extensive familiarity with Spaulding's writing style would have been required. If Spaulding refused to do legal work for the informants, as Spaulding claims, they would have had little opportunity to acquire such familiarity.

45. Spaulding claims that the informants went to the unit law library and used infor- mation gleaned from Spaulding's reported criminal cases to prepare the order. Docket Entry # 1 & E.H., Ex. A at 6–7; Docket Entry # 2 & E.H., Ex. B at 10–11. Spaulding's own witness, Carter, does not support this version of the events. According to Carter's testimony, various inmates came to the law library with the forged order already in hand to determine if Spaulding had received the good time credit awarded him in the order. D.H. at 7–11.

46. The reported decisions concerning Spaulding do not contain the information recited in the order. *See Ex parte Spaulding,* 687 S.W.2d 741 (Tex.Crim.App.1985); *Spaulding v. State,* 656 S.W.2d 538 (Tex. App.—Corpus Christi 1983, pet. ref'd); *Ex parte Spaulding,* 612 S.W.2d 509 (Tex.Crim. App.1981). For example, according to the letter from Roy E. Greenwood, Spaulding's former counsel, No. 9566, as reflected in the order, is the correct number for Spaulding's Victoria County conviction. E.H., Ex. E at 5. Yet, it does not appear in the reported decisions.

47. In order to be awarded good time credit under the Prison Management Act, as the order purports to do, Spaulding would have been required to alter his criminal history because his first conviction was for aggravated rape, which disqualified him from receiving the extra good time credit. *See Ex parte Spaulding,* 612 S.W.2d at 509; E.H. at 84–85. Spaulding had a motive to state in the order that his first offense was robbery, not aggravated rape, in order to benefit from the extra good time awarded in the order.

48. There is no credible testimony linking Jesse Ivey to the order. Also, as stated by Thompson at the evidentiary hearing, knowing that an inmate had been convicted of forgery would make a difference only if the order had that inmate's name on it, not Spaulding's. E.H. at 66.

49. A copy of the order was not found among Spaulding's possessions. It was not actually transmitted to prison authorities in order to obtain good time credit.

*B. Conclusions of Law.*

█ 1. Spaulding's claims must be analyzed in the context of the prison setting. As

the Supreme Court recognized in *Wolff v. McDonnell*, 418 U.S. 539, 561, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974), prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." Lawful imprisonment makes unavailable to an inmate many of the rights and privileges afforded an ordinary citizen due to the needs and exigencies of the institutional environment. *Id.* at 555, 94 S.Ct. at 2974.

■ 2. Prisoners are entitled, however, to the protections of the Due Process Clause of the Fourteenth Amendment. *Id.* at 556, 94 S.Ct. at 2974. They may not be deprived of life, liberty, or property without due process of law. *Id.*

■ 3. Because prison disciplinary proceedings are not part of a criminal prosecution, the full panoply of rights due a defendant in such proceedings does not apply. *Id.* Instead, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. *Id.*

■ 4. Where, as here, the state provides a right to good time credit for satisfactory behavior while in prison, which may be forfeited only for certain offenses, the prisoner's interest constitutes a "liberty" interest under the Fourteenth Amendment. *See Disciplinary Rules and Procedures for Inmates* ("Rulebook"), E.H., Ex. C; *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975; *Gibbs v. King*, 779 F.2d 1040, 1044 (5th Cir.), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986).

■ 5. An inmate charged with an offense that would deprive him of good time credit is entitled to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that his rights are not arbitrarily abrogated. *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975; *Gibbs*, 779 F.2d at 1044.

■ 6. A prison's failure to follow its own procedural rules is an independent violation of due process, even if the rules and regulations provide protection beyond that which is constitutionally required. *Ruiz v. Estelle*, 503 F.Supp. 1265, 1356 (S.D.Tex.1980).

■ 7. In *Wolff*, the Supreme Court set out minimum requirements of procedural due process that must be accorded prisoners:

- written notice of the claimed violation at least twenty-four hours in advance of the inmate's appearance at a disciplinary hearing;

- a written statement of the factfinders as to the evidence relied upon and the reason for disciplinary action taken, unless the exclusion of certain items of evidence is necessary for personal or institutional safety reasons;

- an opportunity to call witnesses and present documentary evidence in defense when permitting the inmate to do so would not be unduly hazardous to institutional safety or correctional goals.

*Wolff*, 418 U.S. at 563–67, 94 S.Ct. at 2978–80; *Smith v. Rabalais*, 659 F.2d 539, 542 (5th Cir.1981), *cert. denied*, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982).

8. The TDCJ Rulebook incorporates these requirements and contains additional safeguards of prisoners' rights, including those mandated in *Ruiz. See* Rulebook at 6–12; *Ruiz*, 503 F.Supp. at 1358–59.

■ 9. Within these parameters, however, federal courts accord prison officials the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order. *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir.1990); *Gibbs*, 779 F.2d at 1044.

■ 10. The adequacy of notice hinges upon whether it is sufficiently detailed to allow the inmate to understand the charges and to marshal the facts in his defense. *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2978; *Freitas v. Auger*, 837 F.2d 806, 809 (8th Cir.1988); *see also* Rulebook § IV(A).

■ 11. The notice of the charges Spaulding received comports with the demands of due process, as it complies both

with the requirements of *Wolff* and the TDCJ Rulebook. Spaulding's claim of insufficient notice of the charges is without merit.

12. Spaulding's due process argument with regard to not being given a copy of the forged order during the hearing is without basis.

13. *Wolff* is silent on whether an inmate may be excluded from a disciplinary hearing. In *Wolff,* however, the Court recognizes:

> The reality is that disciplinary hearings and the imposition of sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonism on the important aims of the correctional process.

418 U.S. at 562, 94 S.Ct. at 2978.

14. TDCJ rules permit exclusion if "hearing the evidence will jeopardize the life and safety of persons or the security and order of the institution," as long as the unit disciplinary hearing officer provides written reasons in the record for the accused inmate's absence during any portion of the hearing. Rulebook §§ VI(A), (E)(2).

15. Merely because Thompson was a correctional officer rather than an inmate does not automatically give Spaulding a right to remain during his testimony. As noted in *Wolff,* "Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. ... Although the dangers posed by cross-examination of known inmate accusers, or guards, may be less, the resentment which may persist after confrontation may still be substantial." 418 U.S. at 562, 568–69, 94 S.Ct. at 2977, 2981.

16. It is appropriate to defer to the hearing officer's judgment that it was necessary to exclude Spaulding in order to preserve internal order and discipline and to maintain institutional security. *See Hewitt,* 459 U.S.

at 472, 103 S.Ct. at 871; *Rabalais,* 659 F.2d at 544.

17. Spaulding's exclusion from portions of the hearing did not violate his due process rights.

18. Under *Wolff,* an inmate facing disciplinary proceedings is allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. 418 U.S. at 566, 94 S.Ct. at 2979.

19. TDCJ rules contemplate an inmate presenting documentary evidence. Rulebook § VI(B)(3). TDCJ rules also permit an inmate to call witnesses "unless the unit disciplinary officer decides that the testimony of such witnesses is likely to jeopardize the life or safety of persons or the security and order of the institution." *Id.* at § VI(B)(4).

20. If witnesses are denied, written reasons must be provided in the record for the unit disciplinary hearing officer's decision. *Id.* Similarly, if confrontation and cross-examination of the inmate's accusers, if requested, is denied, the hearing officer must make a written statement of the reasons for denial. *Id.* at § VI(E)(5).

21. Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but the explanation may either be made part of the disciplinary record or presented later in court if the deprivation of a liberty interest is challenged on that basis. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985).

22. Spaulding asserts that cross-examination of the informant into when, where, and how the order was obtained would have been highly relevant because in the same way it could have revealed the identity of the informant, it could have eliminated Spaulding as a suspect by showing he was not at that location at that time. Much the same argument was rejected in *Rabalais.* There, the only witness, a guard, testified that based on information provided by a confidential informant, inmate Smith was a major narcotics dealer on the trusty yard. 659 F.2d at 541.

The witness consistently refused to reveal the informant's name or any information which he claimed would have revealed his identity, *i.e.*, dates, places, times, persons involved, number of alleged sales witnessed, description of drugs. *Id.* Smith complained that because he was unable to elicit any more facts about the charge, he could not properly present alibi witnesses or opposing evidence. *Id.* at 541–42. Just as in the instant case, the court in *Rabalais* noted the exceptional nature of the information requested:

> [A]ll facts, which under the particular circumstances of this case could lead to the unwarranted identification of the confidential informant—with possible fatal consequences to him—were likewise the very facts needed by Smith to determine if he could establish an alibi for the time, place or date.

*Id.* at 544. The court upheld the actions of the prison officials, finding that they had not abused their discretion in refusing to require the guard to provide Smith the specific information requested. *Id.*

23. Confrontation and cross-examination present great hazards to institutional interests, as there is considerable potential for havoc inside the prison walls. *Wolff*, 418 U.S. at 567, 94 S.Ct. at 2980. If an inmate "proposes to examine an unknown fellow inmate, the danger may be the greatest, since the disclosure of the identity of the accuser, and the cross-examination which will follow, may pose a high risk of reprisal within the institution." *Id.* at 568, 94 S.Ct. at 2981.

24. In *Baxter v. Palmigiano*, 425 U.S. 308, 321–22, 96 S.Ct. 1551, 1559–60, 47 L.Ed.2d 810 (1976), the Supreme Court reaffirmed that the right to call witnesses in prison disciplinary proceedings is a limited one and refused to extend the scope of required confrontation and cross-examination. "Mandating confrontation and cross-examination, except where prison officials can justify their denial on one or more grounds that appeal to judges, effectively preempts the area that *Wolff* left to the sound discretion of prison officials." *Id.* at 322, 96 S.Ct. at 1560.

25. Mandating that Spaulding be given the right to question the informant would impermissibly impinge upon an area left to the sound discretion of prison officials. There is no evidence that in this case, prison officials abused their discretion.

26. Spaulding's due process claim based upon a denial of confrontation and cross-examination rights fails.

27. Handwriting evidence would have been of limited value because Spaulding could have prevailed upon another inmate to forge the judge's name on his behalf.

28. No decision called to this court's attention requires prison officials to accede to an inmate's request for a third-party expert witness.

29. The Supreme Court has repeatedly held that inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." *Baxter*, 425 U.S. at 315, 96 S.Ct. at 1556; *Wolff*, 418 U.S. at 570, 94 S.Ct. at 2981. It would be anomalous to accept Spaulding's position and find that an inmate has a constitutional right to an expert witness at a disciplinary hearing, when he has no right to counsel.

30. In *Wolff*, the Supreme Court recognized that prison officials must of necessity have the discretion to keep the hearing within reasonable limits. *Id.* at 566, 94 S.Ct. at 2979; *see also Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871; *Bell*, 441 U.S. at 547, 99 S.Ct. at 1878.

31. The Court observed in *Wolff*:

> Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

418 U.S. at 566–67, 94 S.Ct. at 2980.

32. Spaulding's contention that his due process rights were abridged when he was denied the opportunity to present expert handwriting analysis is without merit.

33. Spaulding's contention that the hearing officer was not neutral and detached because the investigative officers participated in the deliberations is without basis.

34. In *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985), the Supreme Court held that the requirements of due process are satisfied if some evidence supports the decision by prison officials to revoke good time credits. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Id.* at 455–56, 105 S.Ct. at 2774.

35. If there are some facts or "any evidence at all" in support of the action taken, the decision of prison officials must stand. *Gibbs,* 779 F.2d at 1044; *Stewart v. Thigpen,* 730 F.2d 1002, 1005–06 (5th Cir.1984); *Rabalais,* 659 F.2d at 545.

36. The disciplinary determination must not be arbitrary or capricious, but a reviewing court may not substitute its judgment for that of prison authorities. *Stewart,* 730 F.2d at 1005; *Rabalais,* 659 F.2d at 545; *Wilwording v. Swenson,* 502 F.2d 844, 851 (8th Cir.1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 835, 42 L.Ed.2d 843 (1975).

37. In *Hill,* the Supreme Court expressly declined to adopt a more stringent standard as a constitutional requirement, noting that revocation of good time credits is not comparable to a criminal conviction and neither the amount of evidence necessary to support the conviction, nor any other standard greater than "some evidence" applies in this context. *Hill,* 472 U.S. at 456, 105 S.Ct. at 2774.

38. Under TDCJ rules, an inmate may not be charged with a disciplinary infraction if the sole evidence is that provided by a confidential inmate informant. E.H., Ex. D at 1.

39. An inmate informant's testimony must be corroborated by evidence from other sources. *Id.; see also Freitas,* 837 F.2d at 810.

40. If he had known that the order was not genuine, the informant's admitted intention of using a similar order to obtain good time credit would have been a declaration against his penal interest. *See Id.* at 811; *McCollum v. Williford,* 793 F.2d 903, 906 (7th Cir.1986).

41. In support of Spaulding's contention that the informant was not shown to be reliable, he cites cases from other circuits and lower courts that hold that the disciplinary hearing officer must make independent findings of an informant's reliability on the record. Spaulding cites no Supreme Court or Fifth Circuit cases that impose this stringent requirement. Even in those circuits that require such a determination, the court may allow prison officials' justifications for having considered an informant's testimony as reliable to be presented to the court *in camera. See Taylor v. Wallace,* 931 F.2d 698, 702 (10th Cir.1991), citing *Ponte,* 471 U.S. at 497–99, 105 S.Ct. at 2196–97; *Freitas,* 837 F.2d at 811; *McCollum,* 793 F.2d at 906.

42. Through its review of the confidential information, "the court may determine that the facts contained therein make it inherently reliable and, therefore, that the committee implicitly adopted the credibility determination made by the prison investigator." *Taylor,* 931 F.2d at 702; *accord McCollum,* 793 F.2d at 906; *Dawson v. Smith,* 719 F.2d 896, 899 (7th Cir.1983).

43. In *Rabalais,* the Fifth Circuit found sufficient indicia of reliability and upheld the decision of prison officials, where the testifying witness refused to divulge the names of the informants, but testified that he knew them, that they had firsthand knowledge, and that he had used them in the past. 659 F.2d at 546.

44. Under the method approved in *Rabalais,* there is ample support in this case for the hearing officer's implicit finding of reliability of the informant, although it may approach the "outer contours of the prison discipline due process rule." *Id.*

45. The court notes that it would be preferable for the hearing officer to make explicit findings of reliability on the record and for testimony concerning the reliability of informants to be developed in greater detail at the disciplinary hearing. This would obviate

the need for time-consuming and expensive evidentiary hearings on this issue.

■ 46. An inquiry into the reliability of informants may be diminished or even satisfied where there is corroborating physical evidence of the information provided. *Kyle v. Hanberry,* 677 F.2d 1386, 1391 (11th Cir. 1982).

47. The court cannot dismiss as mere coincidence the consistency between the spelling and idiosyncratic punctuation errors in the order and in Spaulding's submissions. The court finds the order to be compelling corroborating evidence of Spaulding's guilt.

48. Spaulding's alternative explanation for the creation of the order is without basis and lends further support to the notion that Spaulding prepared it.

49. The court discounts the notion that, as Spaulding claims, a fellow inmate forged the order to make it look like Spaulding did it to get back at him for refusing to do legal work for the inmate.

50. The court rejects Spaulding's proffered explanation of the manner in which the other inmates obtained the information to be placed in the order because it is not supported by the facts.

51. The court finds unpersuasive Spaulding's argument that if he had prepared the order he would not have misstated his criminal history. Due to the aggravated nature of Spaulding's actual first offense, he would not have been entitled to the good time credit granted in the order. Tex.Code Crim.Proc. art. 42.12 § 3g(a); D.R. at 31, 63, 66.

52. Spaulding's argument that Jesse Ivey, one of the inmates whom he believes to be an informant, was convicted of forgery, is of no weight, as there is no evidence linking Ivey to the order.

53. Because a copy of the forged order was not found among Spaulding's possessions and it had not actually been transmitted to prison authorities does not diminish the substantial evidence linking Spaulding to the forged order; it may have been intercepted before it reached its intended destination.

54. "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board. Instead, due process in this context requires only that there be some evidence to support the findings made in the disciplinary hearing." *Hill,* 472 U.S. at 457, 105 S.Ct. at 2775.

■ 55. There is more than adequate evidence to support the finding of Spaulding's guilt made by the disciplinary hearing officer.

56. Spaulding's claim of no reliable evidence of guilt must be rejected.

## V. *Conclusion.*

This court finds that in the instant case, Spaulding's due process rights were not violated and there is sufficient evidence to support the finding of guilt. Thus, Spaulding is not entitled to federal habeas corpus relief. Accordingly, this court recommends that Spaulding's petition for writ of habeas corpus be denied and that final judgment be entered for Collins.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties. Under Fed.R.Civ.P. 72, the parties have ten days from receipt to file specific, written objections to the Memorandum and Recommendation. Failure to file objections may lead to dismissal of the habeas corpus petition and bars attack on the factual findings on appeal. The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing parties and to the chambers of the magistrate judge, P.O. Box 610070, Houston, Texas 77208.

Signed in Houston, Texas, on this the 10th day of September, 1993.